```
 1                  UNITED STATES DISTRICT COURT

 2                      DISTRICT OF ARIZONA

 3   United States of America,    )
                                  )
 4              Plaintiff,        )  4:23-cr-00908-SHR-LCK
                                  )
 5         vs.                    )
                                  )  Tucson, Arizona
 6   Eric Ridenour,               )  June 15, 2023
                                  )  3:08 p.m.
 7   _____Defendant.__ )

 8

               TRANSCRIPT OF PROCEEDINGS
 9       DETENTION HEARING REGARDING DANGEROUSNESS

10

          BEFORE THE HONORABLE LYNNETTE C. KIMMINS
11             UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   For the Plaintiff:
          Adam Rossi
14        Rui Wang
          U.S. Attorney's Office
15        405 West Congress Street, Suite 4800
          Tucson, AZ 85701
16
     For the Defendant:
17        Nancy Arce
          Matei Tarail
18        Federal Public Defender's Office
          407 West Congress Street, Suite 501
19        Tucson, AZ 85701

20

21   Transcribed by:
          Cindy J. Shearman
22        405 West Congress Street, Suite 1500
          Tucson, AZ 85701
23        520-205-4286

24             Proceedings were digitally recorded
               Transcript prepared by transcriptionist
25
```

I N D E X

GOVERNMENT WITNESS                                    PAGE

ALEXANDER TISCH

Direct examination by Mr. Rossi                         6
Cross-examination by Ms. Arce                          25
Redirect examination by Mr. Rossi                      37


VICTIM STATEMENT:

JOHN CALEB COLLINS                                     40
DR. HEIDI LODGE                                        41
PEGGY CHRISTIANSEN                                     42


ARGUMENT

By Mr. Rossi                                           43
By Ms. Arce                                            46
By Mr. Rossi                                           58

E X H I B I T S

IDENTIFIED                    OFFERED        ADMITTED

Gov 7                            5              6

```
1                    P R O C E E D I N G S
2              (Call to order of court, 3:08 p.m.)
3              CLERK:  And calling case 23-MJ-1853, United States
4   versus Eric Ridenour, on for a detention hearing.
5         Counsel, please state your appearances for the record.
6              MR. ROSSI:  Good afternoon, Your Honor.  Adam Rossi
7   and Rui Wang for the United States.  Also present with us is
8   Special Agent Alex Tisch.
9              THE COURT:  Thank you, Mr. Rossi.
10             MS. ARCE:  Good afternoon, Your Honor.  Nancy Arce and
11  Matei Tarail for Mr. Eric Ridenour who's present seated between
12  us.
13             THE COURT:  Thank you, Ms. Arce.
14        And good afternoon, Mr. Ridenour.
15             THE DEFENDANT:  Good afternoon, Your Honor.
16             THE COURT:  Mr. Ridenour, my name is Lynnette Kimmins.
17  I'm a magistrate judge.  I'll be conducting your hearing.  If
18  at any time you do not understand something, you have a
19  question for me or your attorneys, please let me know.  And if
20  you need to speak with your attorneys privately, just let me
21  know and we'll give you an opportunity to do that, all right?
22             THE DEFENDANT:  Okay.
23             THE COURT:  This is the time set for Mr. Ridenour's
24  detention/dangerousness hearing.  Are the parties ready to
25  proceed?
```

1           MR. ROSSI:  Yes, Your Honor.

2           MS. ARCE:  Yes, Your Honor.

3           THE COURT:  And, Mr. Rossi, I have a copy of the

4   witness list and also exhibit list.  Any additions or

5   corrections to those lists?

6           MR. ROSSI:  No, Your Honor.

7           THE COURT:  And is the government -- or is the defense

8   anticipating any witnesses at this time?

9           MS. ARCE:  No, Your Honor.

10          THE COURT:  Okay.  And, Mr. Rossi, my understanding is

11  with respect to the victims of this case, that they have been

12  notified of this hearing; is that correct?

13          MR. ROSSI:  That is correct, Your Honor.  The court

14  kindly provided a call-in number for one of the pastors.  I

15  believe she's on the line.  She'll only be listening to the

16  hearing, she does not wish to address the court.

17  Representatives from the Episcopalian church are here, Your

18  Honor, and two of them would like to address the court at the

19  appropriate time.

20          THE COURT:  Okay.  Thank you, Mr. Rossi.  What I would

21  anticipate doing is we'll go forward with evidence regarding

22  the hearing.  Once the evidence is presented, then I'll go

23  ahead and allow the victims to make statements.

24      In addition, for purposes of the record, I have had an

25  opportunity to review the government's motion which is document

1   12 on the docket.  I also received from defense letters from

2   Diane Dalton, Julio Romero, Jr., and C. James Quinn, and I've

3   had an opportunity to review those as well.

4       At this time, Mr. Rossi, if you'd like to call your first

5   witness.

6           MR. ROSSI:  Thank you, Your Honor.  At this time the

7   government would call Special Agent Alex Tisch of ATF.

8           THE COURT:  And, Agent Tisch, if you'd come forward to

9   be sworn in.

10          ALEXANDER TISCH, GOVERNMENT WITNESS, WAS SWORN.

11          CLERK:  Thank you, sir.  You may be seated and, as you

12  are, please speak directly into the microphone and state your

13  name for the record, please, spelling your last name.

14          THE WITNESS:  My name is Alexander Tisch, T-i-s-c-h.

15          THE COURT:  And whenever you're ready, Mr. Rossi.

16          MR. ROSSI:  Thank you, Your Honor.

17      As a preliminary matter, Your Honor, we'd ask that you take

18  judicial notice of the complaint filed in this case, it's

19  document number one.  Since it's already been accepted by the

20  court and signed by a magistrate judge, maybe you can just take

21  judicial notice of it and then we'd like you to admit it for

22  the purposes of this hearing.

23          THE COURT:  And any objection, Ms. Arce?

24          MS. ARCE:  No, Your Honor.

25          THE COURT:  And the complaint, document one, will be

1    admitted.

2              MR. ROSSI:  Thank you, Your Honor.

3                        DIRECT EXAMINATION

4    BY MR. ROSSI:

5    Q.  Special Agent Tisch, could you just give us a brief

6    background about who you are, who you work for, please?

7    A.  I'm a special agent with ATF.  I've been working for them

8    for the last eight years.  Before that I worked for the Pima

9    County Sheriff's Department for almost 12 years as a deputy and

10   a detective.

11   Q.  And do you have information relating to an investigation

12   that involves Eric Ridenour that occurred on or about May 22nd,

13   2023, in Douglas, Arizona, here in the District of Arizona?

14   A.  Yes.

15   Q.  And can you give us a little background about Douglas,

16   Arizona?

17   A.  Douglas is a border town in southeastern Arizona.  Its

18   sister city across the border is Agua Prieta.  In this church

19   or, excuse me, in this town there's a small block that has four

20   different denominational churches in one square block which is

21   the only place in the world that has that.  It has a Methodist

22   church, a Baptist church, an Episcopalian church, and a

23   Presbyterian church in one square block.

24   Q.  And is -- are these churches historical -- historically

25   significant buildings?

DIRECT EXAMINATION - ALEXANDER TISCH                    7

1   A.  Yes, they're all very old.

2   Q.  Over 100 years, would you say?

3   A.  Give or take, yeah.

4   Q.  And on May 22nd, 2023, was there -- well, how did law

5   enforcement become involved in this case?

6   A.  Reports of a fire were made to the fire department in

7   Douglas as well as the police department which caused a

8   response.  Initially, the Episcopalian church was thought to be

9   the only fire that was occurring.  Firefighting efforts

10  occurred at that structure.  During the extinguishing of that

11  building, they noticed that the Presbyterian church behind them

12  was also on fire across a small alleyway.  Firefighting efforts

13  continued into the night to extinguish both buildings.

14  Q.  Can you give us a brief description on the damage that was

15  caused to the buildings?

16  A.  The Episcopalian church is nearly destroyed completely.

17  The roof is completely collapsed.  The Presbyterian church is a

18  little, slightly different construction, it's much taller, but

19  it also has extensive damage, it's unusable.  Both structures

20  are uninhabitable.  And it's unknown if they can be repaired

21  due to their age.

22  Q.  And would it be fair to say that both these churches were

23  involved in, for lack of a better term, interstate commerce?

24  A.  Yes, both structures affect interstate commerce with

25  members of those denominational churches.

1   Q.  And during the course of -- well, once the fires were put

2   out, did investigators enter the building?

3   A.  Yes, fire investigators and fire department personnel

4   entered the scene.

5   Q.  And did they find any items of interest?

6   A.  Yes, they did.  A lighter was found as well as some lighter

7   fluid was found.

8   Q.  And was that in the Presbyterian church?

9   A.  Yes.

10  Q.  And did an ATF canine respond to the scene?

11  A.  Yes, one of our canines who is trained to alert to the

12  presence of accelerant fluid responded and searched the scene.

13  Q.  And did the canine alert to the presence of accelerants?

14  A.  The canine did alert to both churches.  Both fire locations

15  accelerant was present.

16  Q.  Was follow-up investigation done, including seeking

17  security footage from a nearby day-care?

18  A.  Yes.

19  Q.  Before we go into that footage, can you describe something

20  about the, a little bit about where the day-care's located and

21  its relationship to the two churches?

22  A.  Yes.  So in this square block, the Episcopalian church, if

23  you're looking at it from overhead, if you can imagine the

24  Episcopalian church being in the upper right corner, the

25  Presbyterian being in the lower right corner of that block, and

1    a Baptist church on the lower left corner, and the Methodist

2    church in upper left -- excuse me, yeah, upper left corner.

3    Attached to the Methodist church is an active and operating

4    day-care.  The exterior of this day-care has security footage

5    cameras that point to the alleyway of both buildings that were

6    burned, the Episcopalian church and the Presbyterian church.

7    Q.  Were agents able to review footage from that day?

8    A.  Yes, we were.

9    Q.  And what were they able to see around the time that the

10   fires began?

11   A.  Just before the fires started, a blue Pontiac Aztek drove

12   into the alleyway.  A male exited from that vehicle, walked

13   around for a short time in the alleyway, and then walked over

14   to the Episcopal church out of view of this camera.  Several

15   minutes later, the male walked back towards the vehicle he

16   arrived in, he again walked down to the alleyway towards the

17   Presbyterian church, sort of looks both directions, and then

18   walks over to the Presbyterian church out of view of the

19   surveillance cameras.  Several more minutes go by.  The same

20   male exits through the front of the church, which is out to a

21   street, walks down the sidewalk, jumps the fence, and then runs

22   back to the Pontiac Aztek parked in the alleyway, and the

23   vehicle departs the same direction that it arrived.

24        While the vehicle was departing, you can already see smoke

25   coming from the Episcopalian church where the driver of that

1    vehicle just was.

2    Q.  And were agents able to determine if there were any Pontiac

3    Azteks that were registered in the Douglas area?

4    A.  Yes.  We queried some state, local, and federal databases

5    and determined there was only one registered Pontiac Aztek in

6    the Douglas area.

7    Q.  And who was that registered to?

8    A.  To the defendant sitting to your right.

9    Q.  And by indicating that, do you recognize Mr. Ridenour here

10   in the courtroom today?

11   A.  Yes, I do.

12          MR. ROSSI:  Your Honor, we would ask that the record

13   reflect identification of the defendant.

14          THE COURT:  The record will so reflect.

15   BY MR. ROSSI:

16   Q.  And did Mr. Ridenour match the description of the person

17   that's in the video setting -- or entering the churches right

18   before the fire started?

19   A.  Yes, he did.

20   Q.  Did investigators also go to a Walmart retail store in the

21   Douglas area?

22   A.  Yes, sir, we did.

23   Q.  And did they speak to a loss prevention officer?

24   A.  Yes, we did.

25   Q.  And did the loss prevention officer offer that he -- his

1   neighbor drove a Pontiac Aztek?

2   A.  Yes, he identified the vehicle as belonging to his

3   neighbor.

4   Q.  And was that neighbor Mr. Ridenour?

5   A.  It is Mr. Ridenour, yes.

6   Q.  And were agents able to view surveillance footage from the

7   Walmart on that day?

8   A.  From before the fire occurred, yes, we were.

9   Q.  And what did you see?

10  A.  We saw Mr. Ridenour in the Walmart wearing clothing

11  matching the person who was driving the Pontiac Aztek and seen

12  walking between the two churches and then running back to the

13  vehicle.

14  Q.  And based on that, did the Douglas Police Department obtain

15  a search warrant for Mr. Ridenour's residence?

16  A.  Yes, they did.

17  Q.  And did other agents assist in that effort?

18  A.  Yes, we did.

19  Q.  And what was found in Mr. Ridenour's home?

20  A.  The same clothing matching what he was wearing in the

21  Walmart store before and the clothing matching the suspect with

22  the Pontiac Aztek going between the churches was found in a

23  hamper, the pants specifically.

24  Q.  And was he also wearing the same shoes that he was seen

25  wearing entering the Walmart and the person who was going in

DIRECT EXAMINATION - ALEXANDER TISCH                    12

1    between the two churches before the fire started?

2    A.  Yes.  Mr. Ridenour was wearing them when he was detained by

3    Douglas Police Department.

4    Q.  Did they also find a hat, a ball cap, in the Pontiac Aztek

5    that also matched Mr. Ridenour was wearing when he entered the

6    Walmart and the person who was going in between the two

7    churches prior to the start of the fires?

8    A.  Yes, sir, we did.

9    Q.  During the execution of initial search warrant and a

10   subsequent follow-up warrant, did agents find a letter written

11   by the defendant?

12   A.  Yes, we did.

13   Q.  And did the letter refer to the defendant and his wife

14   attending a church in Bisbee, Arizona?

15   A.  Yes.

16   Q.  And did the defendant author the letter?

17   A.  Yes.

18   Q.  And did he describe in the letter how he believed, quote,

19   culture, unquote, was creeping into the church?

20   A.  Yes, he did.

21   Q.  And according to the letter, the defendant, in his own

22   words, did he speak to the pastor of the church in Bisbee about

23   his belief and, as a result, he and his wife were asked to

24   leave and find another place to worship?

25   A.  That's what the letter said, yes.

1   Q.  And on June 2nd, did agents locate and interview the pastor

2   of the Calvary Church in Bisbee where the defendant and his

3   wife had previously worshipped?

4   A.  Yes, I spoke with him.

5   Q.  And did the pastor of the church describe to you what had

6   occurred with Mr. Ridenour?

7   A.  Yes, he did.

8   Q.  Could you describe that to the court, please?

9   A.  He said he asked him to go to lunch.  Mr. Ridenour had

10  expressed that he didn't believe that the church should be

11  allowing women to have a role in being pastors or presenting in

12  front of the church or doing readings.  The pastor of Calvary

13  Church told me this is something that they do, women are

14  allowed to lead prayers and readings.  He said that

15  Mr. Ridenour didn't like that and told him he wouldn't be

16  coming back and, after lunch, he and his wife never came back

17  to the church.

18  Q.  Did agents also speak to one of Mr. Ridenour's neighbors

19  who was also a parishioner from that same church in Bisbee?

20  A.  Yes, I did.

21  Q.  And did that witness state that the defendant was unhappy

22  with the church's views towards worship as the defendant

23  believed that women should not be preaching or leading in

24  prayer?

25  A.  Correct.

1  Q.  And did another neighbor, different neighbor, were they

2  interviewed by agents and that neighbor said the defendant had

3  started his own church after that as he was unhappy with the

4  local churches and that the defendant, quote, didn't like gays,

5  didn't like politicians, and didn't like women in general

6  leading the church, end quote?

7  A.  That's correct.

8  Q.  And did the same neighbor also state that the defendant

9  believed the bible prohibited women and gay people from

10 preaching?

11 A.  Correct.

12 Q.  Did you have a chance to speak with Pastor Collins from the

13 Episcopal church?

14 A.  Yes, I did.

15 Q.  And did he describe to you an event in 2021 where he ran

16 into an individual matching the description of the defendant

17 and another person who he identified as the defendant's wife?

18 A.  Yes, he did.

19 Q.  Can you tell the court about that interaction?

20 A.  Yes.  The pastor told us that -- I believe it was

21 November 14th, 2021.  He recalled the date specifically because

22 the interaction was bizarre to him.  He said that people

23 typically come to the church and ask questions about it and the

24 belief system and how they operate.

25     He said a white male matching Mr. Ridenour's description

1  and a female who identified herself as Elizabeth,

2  Mr. Ridenour's wife, were there asking questions.  He asked

3  specifically about homosexuals in the church, whether or not

4  they were allowed or welcome or allowed to be pastors.  The

5  pastor identified himself as a homosexual.  Mr. Ridenour,

6  according to the pastor, told him he was a sinner and he could

7  repent for his sin of being homosexual.  He told him:  You

8  can't really ask questions like that of our parishioners if you

9  choose to come here.

10      The contact basically ended at that point.  Mr. Ridenour

11  took photographs of the church or the exterior/interior of the

12  church, which is a normal thing I guess for folks to do who

13  visit this historic site, and they departed.

14  Q.  Did the person who matched the description of the defendant

15  with the person who was identified as his wife also ask

16  about -- questions regarding participation in politics and

17  religion by women as well?

18  A.  Yes.  And I should clarify when I spoke earlier.  The

19  pastor never identified Mr. Ridenour as the person but the

20  woman that he was with, he did identify her via photograph,

21  which was Elizabeth Ridenour.

22  Q.  And the pastor of the First Presbyterian Church, the other

23  church that was burned down, is that pastor a woman?

24  A.  Yes.

25  Q.  And is Pastor Collins the pastor for the Episcopal church?

DIRECT EXAMINATION - ALEXANDER TISCH                    16

1   A.  Yes.

2   Q.  And did agents have a chance to speak with other pastors of

3   the other two churches about generally their practice and

4   worship?

5   A.  Yes.

6   Q.  And would it be safe to say, generally speaking, that those

7   two churches are more conservative in their approach?

8   A.  Yes.  They don't have the same type values and they're more

9   conservative in nature.

10  Q.  And would it also be fair to say that, in speaking to

11  agents, the pastors were also concerned for the safety of their

12  parishioners and expressed remorse for what happened to these

13  two other churches?

14  A.  Yes.

15  Q.  And I'm sorry if you already said this but the person who

16  was with, who was with Ridenour -- who matched the description

17  of the defendant, did he also say specifically that he would

18  not attend church with a gay pastor?

19  A.  Yes, he did.

20  Q.  During the course of the investigation, did agents have a

21  chance to go over Mr. Ridenour's previous police contacts?

22  A.  Yes, I have.

23  Q.  And did that involve a misdemeanor criminal damage

24  conviction involving a domestic violence incident with an

25  ex-girlfriend?

1   A.  One of them did, yes.

2   Q.  And in that instance, did it appear that the defendant

3   kicked the woman's door down during a domestic dispute and I

4   guess it happened after the two were separated or something of

5   that nature?

6   A.  The way the police report read was that the woman involved

7   in that case and Mr. Ridenour were involved in some sort of

8   romantic relationship that had gone awry.  She had heard a

9   knock on her door and then noticed that her door had been

10  kicked open by Mr. Ridenour and he came in and gathered his

11  belongings and a firearm and departed and told her she could

12  keep his generator to pay for the damages to the door.

13  Q.  Did Mr. Ridenour also have police contacts for other

14  incidents, including violating a protective order during which

15  he poured sugar into the gas tank of another ex-girlfriend?

16  A.  Two days before that incident of the door being kicked

17  open, another woman made a report that she observed.

18  Mr. Ridenour pouring sugar into her gas tank out of her car

19  outside of her work.  She told the officer that she had a

20  protective order against him at one point.

21  Q.  And yet another incident, did Mr. Ridenour, was he accused

22  of and contacted by police for threatening to beat up an

23  ex-wife's fiance during a dispute about the defendant's refusal

24  to abide by a child custody agreement?

25  A.  I don't believe they contacted him that day but his ex-wife

1  called the police when Mr. Ridenour had showed up to take

2  unannounced custody of their child apparently.  This caused an

3  argument as Mr. Ridenour had a new romantic interest with him

4  and the ex-wife also had a fiance.  There was a yelling match.

5  Mr. Ridenour, according to the victim, threatened to inflict

6  violence upon him but he departed before police arrived and I

7  don't believe they found him.

8  Q.  I want to go back a little bit.  Would it be fair to say

9  this is an ongoing investigation?

10  A.  Mine, yes, the others, no.

11  Q.  Sorry.  Specifically to this case.  Would it also be fair

12  to say that you're just answering the questions that I've asked

13  today and not saying everything that you know about this case

14  thus far?

15  A.  That's correct.

16  Q.  I did want to ask, was there -- did you have an opportunity

17  or did agents have an opportunity, excuse me, to interview

18  potential other witnesses in this matter?

19  A.  Yes, there was another interview done recently.

20  Q.  And was that done with an inmate who was on work detail

21  that was across the street during the time that the fires were

22  set?

23  A.  Yes.

24  Q.  And what did that person have to say?

25  A.  That person told investigators that they witnessed

1    Mr. Ridenour walking inside the Presbyterian church carrying a

2    bag that was weighted.  After a short time he emerged from the

3    church without the bag and began running back towards the

4    alleyway.

5    Q.  Did this person say that that was the last time he saw

6    Mr. Ridenour?

7    A.  No.  In fact, he said he was driving a distinct vehicle, a

8    blue Pontiac Aztek, and he was parked on the street out near

9    the churches and he was watching as firemen arrived.  But

10   before the hoses could get unrolled, he was back in his car and

11   left.

12   Q.  And this was after he had run back to his vehicle or run

13   out of sight of this person and then he saw him later with the

14   vehicle; is that right?

15   A.  Correct.  He ran back to his vehicle, as we saw on the

16   surveillance footage, which matches what the witness said, and

17   then he said later, I don't know exactly how much later, he was

18   out present on the street observing the fire.

19   Q.  I also wanted to go back a little bit to the day-care.  At

20   the time that the fires were set, this was around 10:40 in the

21   morning; is that right?

22   A.  Correct.

23   Q.  And it was, I believe, a Tuesday; is that right?

24   A.  Yes.

25   Q.  And --

1    A.  Actually, I think it was a Monday.  It was the 22nd.

2    Q.  22nd.  On that date, was the day-care open and operating?

3    A.  Yes.

4    Q.  So there were children there?

5    A.  And staff, yes.

6    Q.  And with regard to both of the churches, have they agreed

7    to accept migrants in anticipation of the lapse of Title 42?

8    A.  Yes.  There had been arrangements made where cots were

9    being delivered and Porta-Potties and hand washing stations to

10   potentially take these folks in as they would have nowhere to

11   go once that expired.

12   Q.  And specifically to the Presbyterian church, were there

13   cots set up in an adjacent building to the church that also

14   suffered fire damage?

15   A.  Yes.

16   Q.  And at the time, were any of those cots occupied?

17   A.  No, no one was present.

18   Q.  And also going back in your description of where the

19   day-care was, if someone potentially had set fire to the

20   Methodist church, would that also have meant that they would be

21   setting fire to the day-care?

22   A.  They're connected so it's highly likely that both would

23   have caught fire, yes.

24   Q.  And during your investigation, was it also learned that

25   when firefighters and Douglas PD first arrived at the scene,

```
 1    they learned that there was a homeless individual that was

 2    allowed to stay on the, I believe it was the Episcopal church

 3    presence -- or the Episcopal church grounds?

 4    A.  Property?  Yes.  Behind the church, in the same alleyway

 5    access, there was a van that belongs to the church.  They

 6    allowed a homeless person to stay in the van and live in this

 7    van.  And, from my understanding, he was present when the fires

 8    were set and was evacuated and told to leave by the firemen

 9    when they arrived.

10              MR. ROSSI:  If I could have a moment, Your Honor.

11              THE COURT:  Sure.

12    BY MR. ROSSI:

13    Q.  Just a couple more questions, Special Agent Tisch.  I

14    neglected to ask, the church square, what kind of an area is

15    that around the church square?

16    A.  One side is a park, the other three sides are a mix of

17    residences and businesses, some businesses that are, you know,

18    in older homes.

19    Q.  Is there also apartment complexes close by?

20    A.  Yes.  On the side of the, you know, we imagine that

21    overhead map.  The right side where the two victim churches

22    were, there is an apartment complex right across the street

23    from those two.

24    Q.  Is there a historical society where visitors go to as well

25    across the street from the churches?
```

```
 1   A.  Correct.  Next to the apartment complex is another like
 2   state or city building.
 3   Q.  And I also neglected to ask, does St. Stephen's have an
 4   attached house or apartment building to their church?
 5   A.  Yes.  The main hall of the church at the very back, which
 6   is the side closest to the Presbyterian church, has a structure
 7   made for like a living quarters behind the church.
 8   Q.  And at different times is that structure occupied by
 9   people?
10   A.  That's my understanding today.  On the date of the fire it
11   was not occupied, though.
12   Q.  And did that building suffer fire damage?
13   A.  Yes, it's also a loss.
14          MR. ROSSI:  No further questions, Your Honor.
15          THE COURT:  Thank you, Mr. Rossi.
16      Ms. Arce, cross-examination?
17          MS. ARCE:  Yes.  Just before, Judge, I move for any
18   disclosure pursuant to Rule 26.2 that has not already been
19   made.
20          THE COURT:  And, Mr. Rossi, is there any additional
21   disclosure regarding statements or anything else that has been
22   presented at this time?
23          MR. ROSSI:  I believe there's going to be an
24   outstanding report about the new witness that was interviewed
25   but that has not been prepared yet, to my knowledge.  Also, we
```

1    are attempting to get the surveillance video.  I believe we may

2    have gotten that today but we're not certain that it -- there

3    was a problem with the player and so we're going to

4    double-check and make sure that we have that.  As soon as we

5    have the correct player for the videos, we'll disclose that to

6    the defense.  But everything else, including all the ATF

7    reports that we have so far, have been disclosed to the

8    defense.

9              THE COURT:  Okay.

10             MS. ARCE:  Your Honor, in light of that, I'm moving to

11   strike the witness's testimony about the interview with the

12   inmate since that statement has not been provided to the

13   defense.

14             THE COURT:  And, Mr. Rossi, what's your position with

15   that?

16             MR. ROSSI:  Well, Your Honor, the -- first of all, the

17   agent is simply relaying what was told to him by a witness.

18   That's not anything that's required to be disclosed under this

19   proceeding.

20      I would also note that the interview happened very recently

21   and it also was conducted by another agency and so, while we

22   will be getting that, I don't believe it's been prepared yet

23   and so it does not exist.  So I think that, despite the fact

24   that it is not memorialized, it is still information that is

25   available to the agent and he is passing that along to the

1    court for the specific purpose of this hearing, which we

2    believe is appropriate.

3          THE COURT:  And has Agent Tisch prepared a report

4    regarding the statement from the inmate?

5          MR. ROSSI:  No, Your Honor, he was not present, I

6    don't believe.

7          THE COURT:  He was not present at the interview, is

8    that what you said?

9          MR. ROSSI:  That is correct, Your Honor.

10         THE COURT:  Ms. Arce, anything further?

11         MS. ARCE:  Yes, Your Honor.  I think that the rule can

12   encompass if it was audio recorded, video recorded, or if

13   there's any notes, Your Honor.  So if there's no police report,

14   I think that there's still some kind of record of that out

15   there that the government should be producing to us.

16   Otherwise, if they don't have that, then this shouldn't have

17   been brought up at this hearing.

18         THE COURT:  And I do believe pursuant to Federal Rule

19   Criminal Procedure 26.2(a) that Ms. Arce is correct, that after

20   a government's witness has testified and upon motion from the

21   defendant, the government must produce any statement of the

22   witness that's in their possession, and because Agent Tisch has

23   brought forth statements regarding the inmate but the

24   government does not have any disclosure with respect to that

25   and it appears Agent Tisch was not involved in that interview,

1    I am going to strike that testimony for purposes of this

2    hearing.

3         Anything further, Ms. Arce?

4              MS. ARCE:  No, Your Honor.

5              THE COURT:  Okay.  Would you like to go forward with

6    cross-examination?

7              MS. ARCE:  Yes.

8              THE COURT:  Okay.  And, Ms. Arce, we need to have you

9    speak louder so that we can pick it up on the tape.

10             MS. ARCE:  Yes, Your Honor.

11             THE COURT:  Okay.

12             MS. ARCE:  I'll move the mike closer.

13                           CROSS-EXAMINATION

14   BY MS. ARCE:

15   Q.  Good afternoon, agent.

16   A.  Good afternoon.

17   Q.  Can you tell us more about the cots that were being set up?

18   Did I hear you testify that they're not in the church building

19   itself?

20   A.  I never got to see them.  From what I was told by the

21   police chief was that they were in an annex building adjacent

22   to the main Presbyterian church, the section that burned, it

23   was adjacent.

24   Q.  And what do you mean by "adjacent"?

25   A.  There's a six, maybe six-foot wide sidewalk between the

1    two.

2    Q.   And are there any commercial businesses within the two

3    churches we're talking about, St. Stephen's Episcopal Church

4    and the First Presbyterian Church?

5    A.   Commercial businesses within them?

6    Q.   Yes.

7    A.   Not that I'm aware of, no.

8    Q.   You testified about a surveillance video from a day-care.

9    Does that surveillance video show anyone igniting or setting

10   fire to the churches?

11   A.   No.  Those fires were set inside and this video camera

12   films the alleyway between the two churches.

13   Q.   And you testified that a man believed to be Mr. Ridenour

14   was in the video carrying a plastic bag?

15   A.   Correct.

16   Q.   And you have no indications of what was inside that plastic

17   bag, taking into account the testimony that was just struck?

18   A.   No, I don't know what was in the bag, no.

19   Q.   Okay.  Additionally, there are no eyewitnesses reporting

20   having seen anyone set fire to the churches?

21   A.   No.

22   Q.   And am I correct that there were no physical injuries as a

23   result of these fires?

24   A.   None that have been reported, no.

25   Q.   And the home that was attached to St. Stephen's Episcopal

CROSS-EXAMINATION - ALEXANDER TISCH

1   Church was uninhabited?

2   A.  Correct.

3   Q.  And Mr. Ridenour did not make any inculpatory statements in

4   this case?

5   A.  No.

6   Q.  He never admitted to setting any fires?

7   A.  Correct.

8   Q.  And upon arrest, Mr. Ridenour was not violent towards law

9   enforcement?

10  A.  No.

11  Q.  You discussed a bottle of lighter fluid located at the

12  scene.  Has there been investigation done in terms of

13  determining the ownership of that?

14  A.  Yes.

15  Q.  And there's no evidence that ties Mr. Ridenour to that

16  bottle of lighter fluid?

17  A.  No.

18  Q.  And you testified Mr. Ridenour was at Walmart that morning,

19  and am I correct that he did not purchase any lighter fluid

20  that morning from Walmart?

21  A.  Walmart told us they do not sell that brand of lighter

22  fluid at that store.

23  Q.  Okay.

24  A.  Or that -- I should say not that brand but that specific

25  bottle.

1    Q.  You also testified as to lighters being found at the scene.

2    A.  I know of one which was like a barbecue-style lighter with

3    a, you know, long black metal end.

4    Q.  And there's no evidence currently that Mr. Ridenour owned

5    or purchased that lighter?

6    A.  No, there's no evidence right now.

7    Q.  I believe you testified after speaking with one of

8    Mr. Ridenour's neighbors that Mr. Ridenour built a church on

9    his property?

10   A.  Yes, there's a church on his property.

11   Q.  How big is it?

12   A.  My guess would be maybe 25 feet long by about 10 or 15 feet

13   wide.

14   Q.  So it's nowhere near as large as the two churches involved

15   in this case?

16   A.  Correct.

17   Q.  Also, the church that you testified to in Bisbee, that's

18   the Calvary Church?

19   A.  Yes.

20   Q.  And that's the church in which Mr. Ridenour spoke with the

21   pastor and then no longer attended that church?

22   A.  The discussion didn't happen at the church but that is the

23   church that he was speaking of in the letter, yes.

24   Q.  And the letter, was that letter dated?

25   A.  I don't recall.

1   Q.  So you don't know if it was written a month ago or three
2   years ago?
3   A.  I just don't recall if it had a date on it.
4   Q.  And the church in Bisbee, that church still stands?
5   A.  Correct.
6   Q.  You're not aware of any recent reports of damage to the
7   church?
8   A.  No.  That church, from what the pastor told me, was in the
9   basement of a business along like the old section of Bisbee and
10  I don't believe it's been set fire to.
11  Q.  You also testified as to, I don't know if it was you or
12  other agents speaking with Reverend Caleb Collins, correct?
13  A.  I spoke with him directly, yes.
14  Q.  Okay.  And the conversation that he recalled with a man who
15  he believes resembles Mr. Ridenour was in November of 2021?
16  A.  I think it was November 14th, if I recall correctly.
17  Q.  Of 2021?
18  A.  I believe so.
19  Q.  You testified that Mr. Ridenour was taking photos of the
20  church and that that's normal?
21  A.  That's what the pastor told me, yes.
22  Q.  What else did he say about that?
23  A.  Nothing.
24  Q.  And isn't it true that the pastor invited Mr. Ridenour in
25  to take photos of the stained glass?

CROSS-EXAMINATION - ALEXANDER TISCH                    30

1   A.  That sounds right, yes.

2   Q.  And Reverend Collins never reported that the man he

3   encountered made any threats?

4   A.  Like of physical violence to him?

5   Q.  Yes.

6   A.  No, he didn't tell me that he made any threats towards him.

7   Q.  Or threats of damaging any church?

8   A.  No.

9   Q.  You also testified as to some conversations with some of

10  Mr. Ridenour's neighbors.  Isn't it true that at least one of

11  them commented that they were all surprised by his arrest?

12  A.  I believe so, yes.

13  Q.  And that's despite them knowing his religious beliefs?

14  A.  Them being surprised is despite that?

15  Q.  Yes.

16  A.  I don't -- I don't know why they're surprised.  That's just

17  a statement that they made.

18  Q.  But they made that statement knowing his religious beliefs?

19  A.  I'd have to assume that they do, and I can't do that.

20  Q.  Well --

21          MR. ROSSI:  Your Honor, at this point, I think the

22  questions are asking the special agent to speculate.

23          THE COURT:  Sustained.

24          MS. ARCE:  Your Honor, may I clarify?

25          THE COURT:  You can clarify as to statements that the

UNITED STATES DISTRICT COURT

```
1   neighbors specifically made to Agent Tisch or someone in law
2   enforcement.
3           MS. ARCE:  Okay.
4   BY MS. ARCE:
5   Q.  So -- and you can tell me which neighbor it was or I'm not
6   sure if you're trying to keep that information private but one
7   of the neighbors told you the quote that Mr. Rossi stated about
8   Mr. Ridenour allegedly having problems with homosexuals, women,
9   and politicians in churches?
10  A.  One of the neighbors did say that to one of the other
11  investigators; I was not present for that.
12  Q.  And do you know if it was that same neighbor that said that
13  everyone was surprised about his arrest?
14  A.  Unfortunately, I'm not -- I'm not versed on which neighbor
15  said what at this point, unfortunately.
16  Q.  And none of the neighbors had any firsthand knowledge about
17  the fires?
18  A.  Not that we know, no.
19  Q.  Going back briefly to the letter that we discussed with the
20  date that you don't recall, do you know if that letter was ever
21  sent?
22  A.  I'm not sure.  We saw what was likely the original so I'm
23  not sure if it was ever sent via copy or anything, no.
24  Q.  Were there any plans for violence against any person
25  mentioned in that letter?
```

1  A.  No.

2  Q.  Were there any plans for damage to any property mentioned?

3  A.  No.

4  Q.  Was there any mention of any illegal activity at all?

5  A.  No.

6  Q.  You testified as to a search warrant and isn't it true that

7  Mr. Ridenour's phone was seized?

8  A.  Correct.

9  Q.  And his computer as well?

10  A.  Yes.

11  Q.  And Mrs. Ridenour's phone?

12  A.  Yes.

13  Q.  I want to go now, move on to the prior incidents that you

14  spoke to Mr. Rossi about, starting with the allegations or case

15  involving sugar in a gas tank.  Those allegations are from

16  March of 1997, correct?

17  A.  Yes.

18  Q.  And the documents you've reviewed don't contain court

19  documents?

20  A.  No.  It was a Phoenix Police Department case report what I

21  reviewed for that incident.

22  Q.  And that police report doesn't contain any admissions from

23  Mr. Ridenour?

24  A.  No, just the victim's allegation.

25  Q.  And the damage noted or estimated was $200?

1   A.  I don't recall that the gas tank had a damage amount.  I

2   think the broken door was $200, but I don't recall the gas tank

3   police report saying a value.

4   Q.  Just a second.  If I can direct you to the Government's

5   Exhibit 4.  You have a binder up there with you?

6   A.  I don't have anything.

7           MS. ARCE:  Your Honor, may I approach the witness?

8           THE COURT:  Yes.

9   BY MS. ARCE:

10  Q.  And, again, if I could direct your attention to the

11  Government's Exhibit 4.  Let me know once you've had a chance

12  to review it.

13  A.  I've reviewed it.

14  Q.  In reviewing that document, does it refresh your

15  recollection at all about any damage noted for the gas tank?

16  A.  I don't recall it but I see it now here that it says $200.

17  Q.  Okay.  Thank you.

18      So no person was injured in that incident?

19  A.  No.

20  Q.  And no person was threatened with injury?

21  A.  No.

22  Q.  And March of 1997, that was over 26 years ago?

23  A.  Yes.

24  Q.  Moving on to the door incident, that also occurred over

25  26 years ago?

1   A.  Yes.  It was reported two days after the gas tank incident,

2   March 8th, I think.

3   Q.  And the report indicates that Mr. Ridenour had been living

4   in that residence for the past three months?

5   A.  Yes.

6   Q.  And, as you testified, he took his belongings and then

7   left?

8   A.  That's what the report says, yes.

9   Q.  And I think we covered this earlier.  The damage to the

10  door was $200?

11  A.  That's what the victim said, yes.

12  Q.  Are there also court documents that you've reviewed

13  pertaining to that case?

14  A.  Yes.

15  Q.  And isn't it true Mr. Ridenour was placed on probation for

16  24 months?

17  A.  Yes.

18  Q.  And you're not aware or you haven't reviewed anything

19  showing any probation violations?

20  A.  No.

21  Q.  And in those documents, the victim never stated that

22  Mr. Ridenour physically harmed her?

23  A.  No.

24  Q.  I want to discuss now the incident involving Mr. Ridenour's

25  ex-wife.  That is from 1998, correct?

1    A.   Yes.   I think it was actually a year to the day after the

2    door kicking report.

3    Q.   And it involved a dispute over child visitation?

4    A.   Correct.

5    Q.   And there was no active protection -- order of protection

6    at that time between Mr. Ridenour and his wife?

7    A.   No, not that I was provided.

8    Q.   And the allegations were verbal in nature?

9    A.   Yes.

10   Q.   No -- there's no physical harm to anyone?

11   A.   Not that I read in the report, no.

12   Q.   And there were no weapons involved?

13   A.   Not in the report, no.

14   Q.   And no property was damaged?

15   A.   No.

16   Q.   And isn't it true that the reports indicate at one point

17   that Mr. Ridenour was going to contact the police?

18   A.   Yes, I think so.

19   Q.   And that case also involved Mr. Ridenour's ex-wife's then

20   boyfriend?

21   A.   Correct.

22   Q.   And, agent, based on your experience with the sheriff,

23   generally in law enforcement, you would agree that people lie

24   sometimes in child custody or visitation disputes?

25   A.   Yes, that's my experience.

CROSS-EXAMINATION - ALEXANDER TISCH                    36

1    Q.  And you agree that ex-spouses may have animosity towards

2    one another?

3    A.  Of course.

4    Q.  And the court documents that you reviewed indicate that

5    Mr. Ridenour took the case to trial?

6    A.  Yes.

7    Q.  And he was found not guilty?

8    A.  That's my understanding, yes.

9    Q.  And, agent, since 1998, has Mr. Ridenour, from what you've

10   researched, been convicted of a crime?

11   A.  No.

12   Q.  Apart from the instant offense, has he been charged with a

13   crime?

14   A.  Not that I'm aware of, no.

15   Q.  Has he been arrested for any crime?

16   A.  No.

17   Q.  Did you find any indications of warrants for failing to

18   appear?

19   A.  Nothing that I know, no.

20          MS. ARCE:  Your Honor, may I have a moment?

21          THE COURT:  Yes.

22          MS. ARCE:  That's all I have.  Thank you, agent.

23          THE COURT:  Thank you.

24       And redirect, Mr. Rossi?

25          MR. ROSSI:  Yes, Your Honor.  Thank you.

1                    REDIRECT EXAMINATION

2   BY MR. ROSSI:

3   Q.  Special Agent Tisch, there was a question about whether or

4   not there was any video showing anyone starting the fire.  The

5   security camera footage from the day-care center, it doesn't go

6   through buildings, right?

7   A.  No, it doesn't, it just films the alleyway.

8   Q.  And there's no security camera footage for either of the

9   churches, is there?

10  A.  Neither church had an interior or exterior surveillance

11  footage, no.

12  Q.  But in the video from the day-care, is smoke already

13  visible by the time Mr. Ridenour gets back to his Aztek SUV?

14  A.  Yes.  While he's departing, smoke can be seen coming from

15  the Episcopal church.

16  Q.  And according to the video, he went into the Episcopal

17  church first and then made his way to the Presbyterian church;

18  is that right?

19  A.  Correct.

20  Q.  There was a question about the Bisbee church and about how

21  it hadn't been burned down.  Have others, including the pastor

22  of the Bisbee church, expressed to the victims in this case,

23  other faith leaders in the community, expressed to the victims

24  in this case that they're also fearful for their churches and

25  their congregations based on the actions of the defendant?

1  A.  That's what I've heard, yes.

2  Q.  There was a question about Pastor Collins inviting the

3  defendant in.  Did Pastor Collins invite the defendant into the

4  church or the person matching the description of the defendant

5  into his church through the same door that the defendant

6  entered on the day that the fires were started?

7  A.  That's my understanding, yes.

8  Q.  And then did he also, in the conversation with Pastor

9  Collins, tell him that he needed to repent?

10  A.  That's what he told me, yes.

11  Q.  And there was also a question about interstate commerce.

12  Generally speaking, are both these churches members of a larger

13  church community, including both national and international

14  organizations?  The Episcopal church is a member of the

15  worldwide Anglican Communion and the Presbyterian church is

16  part of the National Presbyterian Church, USA; is that right?

17  A.  Correct.

18  Q.  And do both of them host organizations that are national in

19  nature, including the Episcopal church regularly hosting AA

20  meetings and Alcoholics Anonymous is an international

21  organization?

22  A.  Correct.

23  Q.  And did they also make preparations, both churches, to

24  shelter undocumented noncitizens with the expiration of

25  Title 42?

REDIRECT EXAMINATION - ALEXANDER TISCH

1  A.  That's what the plan was, yes.

2  Q.  And while the letter -- there was a question about the

3  letter that was written by Mr. Ridenour that was found in his

4  home.  Did that letter also complain of culture creeping into

5  the churches that he had attended?

6  A.  Yes, it did.

7  Q.  And there was a lot of questions about the prior incidents,

8  including the sugar in the gas tank and breaking down the door.

9  Those items are property, are they not?

10  A.  Yes, they are.

11  Q.  And would it be fair to say he damaged said property after

12  a dispute with someone he didn't agree with?

13         MS. ARCE:  Calls for speculation.

14         THE COURT:  I'll sustain it.  If there's specific

15  information in the reports that you want to address --

16         MR. ROSSI:  Sure.

17         THE COURT:  -- Agent Tisch to, you can do that.

18         MR. ROSSI:  I will do that, Your Honor.

19  BY MR. ROSSI:

20  Q.   Was Mr. Ridenour involved with a domestic dispute that he

21  poured sugar into her gas tank and she had or at least

22  previously had an order of protection out against him?

23  A.  She identified herself as a romantic, as the relationship

24  being romantic in nature and that it was over and there was a

25  protection order before this incident occurred that she alleged

1    to the police.

2    Q.  And for the woman who reported that Mr. Ridenour broke down

3    her door, did she also claim to have an order of protection and

4    that they were involved in a romantic relationship and there

5    was some sort of dispute between them?

6    A.  Correct.

7              MR. ROSSI:  Thank you, Your Honor.  I have no further

8    questions.

9              THE COURT:  Agent Tisch, you may step down.

10             THE WITNESS:  Thank you.

11             THE COURT:  And, Mr. Rossi, any other witnesses?

12             MR. ROSSI:  No, Your Honor.  The only thing left for

13   the government is the statements from the victim

14   representatives.

15             THE COURT:  Okay.  If you'd like to discuss with the

16   victims who's going to make a statement and then the order that

17   they'd like to do it, we'll have them come to the podium.

18        And I will note for purposes of the record, under the

19   Crimes Victim Act, 18 USC 3771(a)(2) and (a)(4), the victims do

20   have a right to be heard at this proceeding.

21        Sir, if you would please state your name and then you're

22   more than welcome to make a statement.

23             PASTOR COLLINS:  Yes.  My name is John Caleb Collins.

24   I am the vicar and priest in charge at St. Stephen's Episcopal

25   Church in Douglas, Arizona, and St. John's Episcopal Church in

1    Bisbee, Arizona.

2              THE COURT:  And, Pastor Collins, feel free to make

3    your statement.

4              PASTOR COLLINS:  Thank you, Your Honor.  Our community

5    has expressed considerable fear that we may be targeted again.

6    In the aftermath of the actions of the allegations towards the

7    defendant, we have received increased hate messages online,

8    including incidents of people glad that fire was set to our

9    church.

10        I also happen to be the vicar at St. John's Episcopal

11   Church in Bisbee, which is currently, currently unharmed.  And

12   so we are afraid that if the defendant were allowed to be

13   released, that we could become targets.  And I live in Bisbee

14   and am deeply concerned for my own safety as well as the safety

15   of others, Your Honor.

16             THE COURT:  Thank you.

17        And if you can also state your name.

18             DR. LODGE:  Good afternoon.  I'm Dr. Heidi Lodge,

19   L-o-d-g-e, and I've been a member of St. Stephen's for 16 years

20   with my husband and I also work in Douglas and Bisbee.  I work

21   at a medical clinic in Douglas and I cover the hospital in

22   Bisbee.

23        And I have numerous patients of all four churches and also

24   members of the communities and I would just echo what Father

25   Collins said is that people are afraid.  Parishioners from all

```
 1   three churches have voiced ongoing fear and reluctance to
 2   attend events, reluctance to go to church.
 3       This upcoming week is pride week in Bisbee and I've had
 4   patients express extreme fear of going to celebrate pride week.
 5   So there is definite effect on all the communities.  And,
 6   again, I just echo that we are afraid for ongoing violence.
 7           THE COURT:  Thank you.
 8       And, Mr. Rossi, any other victims at this time that wish to
 9   make a statement?
10           MR. ROSSI:  No, Your Honor.  The other victim
11   representative -- Your Honor, I just learned that the other
12   pastor would like to make a statement if that's okay with the
13   court.
14           THE COURT:  Okay.
15           MR. ROSSI:  She's still on the line.
16           THE COURT:  And we'll unmute her.  And what's her
17   name?
18           MR. ROSSI:  It's --
19           PASTOR CHRISTIANSEN:  Peggy Christiansen.
20           THE COURT:  Okay.  And, Pastor Christiansen, if you
21   would like to make a statement, you are welcome to do so at
22   this time.
23           PASTOR CHRISTIANSEN:  So I want to say that, first of
24   all, we, our church has been working with the City of Douglas
25   and the Border Patrol and the Customs and the county emergency
```

1  management services for the past couple of months regarding the

2  ending of Title 42.  It has been publicized that we were going

3  to be a shelter if it was needed and we did set up cots in the

4  church and we were on call with the Border Patrol as well as

5  the customs and everybody in the community knew it.

6       THE COURT:  Okay.  Anything else?

7       PASTOR CHRISTIANSEN:  And also, I would like to echo

8  that this incident has deeply shaken up the community of

9  Douglas as well as our colleagues in Bisbee and people are just

10  really shaken and scared.

11       THE COURT:  Thank you.

12    And anything further, Mr. Rossi, from the government?

13       MR. ROSSI:  No, Your Honor.  Thank you.

14       THE COURT:  Ms. Arce, anything from defense?

15       MS. ARCE:  Only argument, Your Honor.

16       THE COURT:  Okay.  Mr. Rossi, I'll let you go forward

17  first with argument.

18       MR. ROSSI:  Thank you, Your Honor.

19    I know the court has read our memorandum and has heard from

20  the victim representatives so I won't belabor the point but as

21  the victim representatives pointed out, this has affected all

22  the churches, the entire community of southeastern Arizona.

23    The nature and circumstances of the offense are extremely

24  concerning.  The fact that these fires were set during the

25  daytime, during a weekday, in the middle of a historic

1   district, surrounded by residential areas, surrounded by a

2   place where it's a historical society where people go to get

3   information about the area, where people visit and frequently

4   take pictures apparently of the churches because of their

5   historical significance, and the fact that there was an

6   operating day-care with staff, children present just across the

7   alleyway, not to mention the fact that there was a homeless

8   person that was staying at the Episcopal church, there was

9   absolutely no knowledge that we can tell from the evidence

10   presented that the person who set the fires, allegedly the

11   defendant, had any consideration for who may or may not be in

12   these buildings.

13       The fire department had to pull the homeless individual

14   out; he wasn't even aware of it.  The cots that Pastor

15   Christiansen mentioned were already set up and were waiting for

16   possible Title 42 migrants.  And that building sustained fire

17   damage.  So it's only by sheer luck that the defendant didn't

18   harm anyone in this case.

19       The weight of the evidence against the defendant is strong.

20   He's caught on video camera, he's identified, he's wearing the

21   same shoes when he's contacted by police, the clothing was

22   found, he's driving a very distinct vehicle, he's seen on

23   camera entering the location, the Episcopal church, the same

24   door that he was showed in two years earlier, one and a half

25   years earlier by Pastor Collins.  He then goes over to the

1    Presbyterian church and by the time he gets back, there's

2    already fire that's coming from the Episcopalian church.

3         The other evidence that was presented today about his

4    interaction with other, with neighbors, with other church

5    leaders is also of concern, especially in light of which

6    churches were set on fire.  He's openly expressed to other

7    individuals that he doesn't believe that gay or women should

8    have any position of leadership in the church, should not be

9    leading any prayers.  He expressed that to a pastor in Bisbee

10   and was asked to leave the church.  That's when he started his

11   own church and after that is when these fires were set.  These

12   two churches have a gay pastor and a woman pastor and the other

13   churches are more conservative in their leanings and, while

14   they have nothing to do with this, it's very noticeable that

15   these two churches were the ones that were targeted.

16        All of these factors and the history and characteristics of

17   the defendant weigh against his release.  He committed an

18   exceptionally dangerous crime with, frankly, cold indifference

19   for human life and property and the, based on the two churches

20   that were targeted and the defendant's statements to other

21   witnesses, deeply personal attack on the communities of faith

22   that are in Douglas and the surrounding areas, it's hard to

23   overstate the impacts that this crime has had and the

24   defendant's actions have had on the community in southeastern

25   Arizona.  They're fearful, they are afraid, we heard today,

1   even to attend church services.

2       Although the prior incidents and contacts with law

3   enforcement occurred years ago, they show a pattern of someone

4   who causes or threatens harm to others when he encounters

5   conflict with them and, given the nature of the offense and the

6   facts of the apparent motivations of the offense, it is clear

7   that the government has met its burden.  The defendant is a

8   danger to the community and we'd ask that you hold him pending

9   trial.  Thank you.

10          THE COURT:  Okay.  Thank you, Mr. Rossi.

11      Ms. Arce?

12          MS. ARCE:  Thank you, Your Honor.

13      We are all sympathetic here to the victims and to their

14  loss and really to the loss of the community but I do think

15  it's important to remember where we are in this case.  This

16  isn't a sentencing hearing, there hasn't been any admission or

17  finding of guilt.  Mr. Ridenour's presumed to be innocent.  And

18  that's something that the Bail Reform Act is clear that does

19  not change when the court is considering release conditions.

20  And as the court and the government are aware, the weight of

21  the evidence is the least important factor for the court to

22  consider when determining release.

23      That being said, I disagree with the government's position

24  that the evidence is strong or that it weighs in favor of

25  detention.  I think that the evidence presented here is

1 extremely circumstantial and tenuous.  There's no -- there's

2 been no admission of guilt, no inculpatory statement from

3 Mr. Ridenour, no eyewitnesses.  There's been testimony about a

4 video which the defense has not seen that video.  However,

5 assuming that the testimony was accurate, it establishes only

6 mere presence, which is not a crime.

7   There's no forensic evidence tying Mr. Ridenour to the

8 crimes.  There has been investigation into who could have

9 purchased that bottle of lighter fluid; nothing has come back

10 to Mr. Ridenour.

11   The agent testified that pursuant to the search warrant,

12 Mr. Ridenour's phone and computer were seized but we heard no

13 evidence of any incriminating or inculpatory evidence on those

14 devices, the phone, the laptop, or on Mrs. Ridenour's phone.

15   Additionally, Your Honor, I think in weighing the or

16 looking at the weight of the evidence, the court should not

17 only look at the acts of the fires but also at the evidence or

18 lack of evidence presented as to whether the churches affected

19 interstate commerce.  I think the evidence here has been, as I

20 mentioned, tenuous.  There's some mention of the churches being

21 part of certain organizations or having, I'm sorry if I'm

22 misstating it, having headquarters somewhere else or being

23 involved.  Those, I think, are tenuous, and I think the court

24 can consider that in the weight.

25   There's a Ninth Circuit case, *United States versus Lamont*.

1    There the court held that setting fire to a church did not fall

2    within the scope of a federal arson statute since that church

3    was not used in interstate commerce.  The court noted that

4    ordinarily setting fire to a church does not constitute a

5    federal offense since churches' primary functions are

6    essentially noncommercial, noneconomic.

7        In a later case, Ninth Circuit, *United States versus Mahan*

8    or *Mahan*, the court in speaking about the church in the *Lamont*

9    case noted that the purported involvement of those churches

10   with interstate commerce were all passive.  And those purported

11   involvements were the church received gas from Canada, there's

12   an out-of-state company -- it was insured by an out-of-state

13   company, it purchased goods from out of state, and it received

14   funds from out-of-state members and it received and distributed

15   publications that traveled through interstate.  The court noted

16   that all of those were held to be too tenuous and did not

17   satisfy the federal statutes.  So I think the court can

18   consider the lack of evidence in determining or in weighing the

19   evidence against Mr. Ridenour, can look at that element as well

20   and what has been shown.

21       There was mention of Title 41 and the cots.  Seems like

22   preparations were being made and if any had been made, they

23   weren't actually in the building that the -- the church

24   building, it was in an adjacent building.  So I think in

25   looking at the weight of the evidence, I don't think it weighs

1    in favor of detention.

2        As the court's aware, the court also looks at the history

3    and characteristics of the person in determining release.  And

4    I do think that these factors weigh heavily in favor of

5    release.  Mr. Ridenour has substantial family ties, community

6    ties, and he's been in the state of Arizona for much of his

7    life.  Pretrial services has been able to verify some of this

8    information in speaking with his wife.  Mr. Ridenour's a US

9    citizen, he's been married to his wife, Elizabeth, for over

10   20 years, he's lived and worked in Arizona towns for much of

11   his life.  Specifically in Douglas, he's been there for about

12   three to four years.  He's a homeowner.  He and his wife own

13   their property and have invested money into it over the years.

14   Prior to Douglas, as I mentioned, he lived in other Arizona

15   towns.  He's worked in Arizona in a school, doing construction,

16   and electrician work.

17       There are no reports of any mental health issues brought to

18   the court.  That's something the court can consider as well.

19   There's no indication of any substance abuse.  Pretrial

20   services noted that he drinks wine with dinner from time to

21   time.  That's something he can certainly stop doing if he were

22   to be released but there's no addictions here, no mental health

23   concerns that would interfere with any obligations to the court

24   or with him understanding any potential release conditions.

25       Mr. Ridenour is not on probation or parole for any offense.

1     There are no warrants out for his arrest.

2     There's no documented failures to appear that have been

3 presented.

4     His criminal history, which I'll touch on a bit later but

5 just briefly for these purposes, it's de minimis and remote,

6 dates back to 25 years ago.

7     Mr. Ridenour, as indicated by pretrial services, does not

8 travel out of the country much.  He reported he's gone to

9 Mexico once about 30 years ago to go eat.

10     He doesn't have access to large sums of money.  He can't

11 just pick up and leave, leave his property behind.

12     He has some health concerns.  I don't think those weigh in

13 favor of detention.  He has a doctor in Tucson, Arizona, that

14 he's been seeing.  And his condition has actually deteriorated

15 while in custody.  He gets his medication mailed to his home.

16     I think it's clear, based on all of his ties, that having

17 been here for most of his life and having so much here, he's

18 not a flight risk.

19     In turning to both the nature of the offense and nature and

20 seriousness of the danger or any purported danger to a person

21 or community, I do want to note briefly something stated in the

22 government's memo that was submitted.  The government cites --

23 excuse me, the government argues that this offense is a crime

24 of violence but it's only citing to an unpublished Arizona

25 district court case, not any binding Ninth Circuit case law.

1          THE COURT:  Couldn't it also be a crime of violence

2     based on the allegation of the destructive device?

3          MS. ARCE:  Your Honor, I don't think --

4          THE COURT:  There was a fire or explosive?

5          MS. ARCE:  Your Honor, I may have to refer to the Bail

6     Reform Act but I understood it that there had to be some kind

7     of device, for example, Molotov cocktail or something in that

8     regard or a bomb.  I don't believe -- and I don't believe the

9     government has argued that but our position is that it does not

10    meet that definition because there's been no evidence presented

11    of any kind of device used.

12         THE COURT:  And, Mr. Rossi, you'll get a chance to

13    rebut when she's done if -- go ahead.

14         MR. ROSSI:  I'm not trying to rebut, Your Honor.  I

15    just wanted to point out that for this -- the purposes of this

16    hearing specifically, we agreed that the -- under 3142

17    "destructive device" has to be an actual device.

18         THE COURT:  Okay.

19         MR. ROSSI:  And since there's not been any evidence

20    presented against that defense, that point is correct.

21         THE COURT:  Okay.  So the government's position that

22    it's a crime of violence is based on the offense itself under

23    844(i)?

24         MR. ROSSI:  That's correct, and the definitions under

25    3156 as cited in the memorandum.

1          THE COURT:  Okay.  Thank you.

2      Go ahead, Ms. Arce.

3          MS. ARCE:  Yes, Your Honor, that's where I was going

4      to next.

5      So in the unpublished district court case cited by the

6      government, that case states that this statute constitutes a

7      crime of violence but it really lacks any analysis.  It has a

8      footnote that cites 18 USC 3146 which, in turn, has a

9      definition of crime of violence.  That definition states:  The

10      term "crime of violence" means an offense that has an element

11      of the offense, the use, attempted use, or threatened use of

12      physical force against the person or property of another;

13      subsection (b):  any offense that is a felony and that by its

14      nature involves a substantial risk that physical force against

15      the person or property of another may be used in the course of

16      committing the offense.

17      I think it's arguable whether the facts of this case meet

18      that definition.  I'd like to highlight for the court the term

19      "physical force".  I think when you think of physical force,

20      you think of hitting, striking.  I did a brief search, as did

21      my co-counsel.  We couldn't find any Ninth Circuit case citing

22      that this offense is a crime of violence.  And I think perhaps

23      that's why the unpublished district court decision is in the

24      government's memo.  I think it's arguable whether there was

25      any, quote, physical force against a person or property of

1    another given that there's been no evidence of any physical

2    force.

3           THE COURT:  What about the Fourth Circuit and the

4    First Circuit cases that they also cite under arson being a

5    crime of violence?

6           MS. ARCE:  Well, Your Honor, first, I'd note that

7    those are nonbinding as they are other circuits but I believe

8    one of those cases was an immigration court case and I didn't

9    have time to review those cases entirely but I think it's

10   significant or important that there's no Ninth Circuit case

11   that was cited to.

12          THE COURT:  Thank you.

13          MS. ARCE:  And, Your Honor, it's clear that this was a

14   terrible crime.  However, it is important to note that there

15   were no physical injuries and no one was harmed.  The

16   government stated that it was by sheer luck that no one was

17   harmed but, in reality, they don't know the circumstances of

18   the fire.  They -- there was no one there to say, you know, how

19   it was set and whether or not there was a disregard for the

20   presence or absence of people.  For all we know, whoever set

21   the fire could have done so because the churches were empty.

22   So I disagree that it was by sheer luck that no one was

23   injured.

24      With no other evidence -- with no evidence showing that, it

25   could be just as likely that it was intentional that it was

1    property only and that it was in daylight so that people were

2    around, walking around town and could see it.  So we don't know

3    the circumstances of how the fire was set but we do know that,

4    in fact, no one suffered any physical injury.

5        And, Your Honor, I don't believe that the government has

6    been able to prove by clear and convincing evidence that

7    Mr. Ridenour's a danger to the community.  I think that the

8    incidents that were testified to from over 25 years ago don't

9    show any kind of pattern that's at all relevant here, if they

10   even show a pattern at all.  Those were misdemeanor arrests and

11   they don't show anything that is pertinent to this case here.

12   They were misdemeanor, they were nonserious, none of them

13   involved physical harm to any individual.  Any of the property

14   damage was minor, nothing in comparison to the facts in this

15   case with two churches that are at a total loss.  The cases

16   involved $200 of damage.  I think there's a big difference

17   there and it's obviously very tenuous because of the time that

18   has passed.

19       Notably, Mr. Ridenour has never been convicted of any

20   felony offense, and the agent testified that within the

21   preceding 25 years, he wasn't arrested for anything.  He hasn't

22   been charged with anything.  He indicated, and I think it's

23   corroborated by pretrial services, you know, there's no

24   indication that he has violated any conditions of release, any

25   condition of probation.  There are no warrants alleging failure

1   to appear.  He doesn't have that history there.  This history

2   presented by the government is, frankly, presented because it's

3   all they have because Mr. Ridenour has been a law-abiding

4   member of the community for the past 25 years.

5       The agent also testified that he -- that the neighbors,

6   Mr. Ridenour's neighbors were surprised to hear about this and

7   I think that that is because of his history, because he's not

8   someone who's, you know, getting the police called on him left

9   and right.  He's a contributing member of the society.

10      And, Your Honor, I did provide the government and the court

11  with some letters from some members of the community, including

12  two of Mr. Ridenour's neighbors.  These are -- these letters

13  were notarized.  One of them from Mr. Romero, he states he's

14  known Mr. Ridenour for about three years, three years that

15  they've been neighbors, that Mr. Ridenour has been a friendly

16  neighbor, that he's been kind and nonthreatening.

17      Another neighbor, Ms. Diana Dalton, she talks about how

18  helpful he is and how she's seen him to be a law-abiding

19  citizen.  She's also known him for approximately the same

20  amount of time since Mr. Ridenour and his wife moved into the

21  community.  She notes that he's helped her out on multiple

22  occasions, states that she could not have been more stunned of

23  what he's been accused of.  This shows us that this is

24  something -- this allegation is something that would be out of

25  character for Mr. Ridenour.

1        And these are members of the community, just like the

2    victims that we heard from.  These also are neighbors and are

3    members of the community and they know Mr. Ridenour and they

4    know him well enough and feel comfortable enough to write these

5    letters for us to submit to the court and to have them

6    notarized as well.

7        The other remaining letter, Your Honor, is from his

8    brother-in-law, Eric, who has nothing bad to say about

9    Mr. Ridenour.  He's known him to be a very responsible man.

10   And a pleasure to be around.

11       I think that these letters and his lack of criminal history

12   are more indicative of his lack of being a danger to the

13   community and his ability to comply with any potential orders

14   that the court might set for release.

15       Your Honor, the government also presented evidence about

16   Mr. Ridenour's religious beliefs.  And whether we agree with

17   them or not, his beliefs, he's free to have those beliefs and I

18   think that it's a large -- a giant leap in logic to go from or

19   to believe what the government is saying, that because he

20   doesn't agree with the practices in those churches, he's going

21   burn them down.  That's a giant leap.

22       I think what does make sense is what has been shown, that

23   he didn't agree with those beliefs so he stopped going to those

24   churches or he just didn't go to those churches and he built

25   his own church.  To go from not approving a belief to burning

1   down a church, that motive is tenuous and there's nothing else

2   that would explain it.  As I indicated, no mental health issues

3   to kind of fill in that gap that's -- that we have here.

4        So I think when the court considers the nature of the

5   offense and the nature and seriousness of any potential danger

6   that Mr. Ridenour may be to the community, the court needs to

7   look at his spotless record for the last 25 years and, again,

8   our position is that the government has not proven that this is

9   a crime of violence, did not prove by clear and convincing

10  evidence that Mr. Ridenour's a danger to any person or to the

11  community.

12       This is also not a presumption case.  The Ninth Circuit has

13  stated that only in rare cases should release be denied and any

14  doubts regarding proprietary release should be resolved in

15  favor of defendants.  I think that there are a lot of

16  conditions that the court can impose to mitigate any concerns

17  that are -- that the court may have about Mr. Ridenour's

18  presence in the community.

19       I think that one of the options the court has is ankle

20  monitoring, a GPS ankle monitor.  He can be ordered to stay

21  away from any churches, to keep a certain distance.  He can

22  have house arrest, he can call in or check in to pretrial

23  services as often as they would like.  He doesn't have any

24  substance abuse or mental health issues but he'd be willing to

25  comply with any conditions as to those areas, Your Honor.

1        There are conditions that the court can impose.  And when

2   imposing conditions, the court should also impose the least

3   restrictive conditions.  So I think that there is a way here to

4   mitigate any potential concerns and there are conditions that

5   can be imposed.  Any amount of conditions with various levels

6   of severity from house arrest to stay away from certain

7   locations, and he's willing to comply with all of those.

8        I'll also note that pretrial services found his wife,

9   Elizabeth, to be a suitable third-party custodian.  She's in

10  the courtroom if the court has any questions about their home

11  or about her suitability as a third-party custodian.  Thank

12  you.

13            THE COURT:  Thank you, Ms. Arce.

14       Mr. Rossi?

15            MR. ROSSI:  Thank you, Your Honor.

16       Your Honor, pretrial services also recommends detention and

17  we would ask that you accept the recommendation.  And we

18  believe it's well made.

19       There was some talk about how there's a leap of logic

20  between the motivation that has been expressed today and to

21  others in the community by the defendant and in letters, and

22  the action of setting the churches on fire.  But there's not a

23  leap of logic when the defendant is on video.  There's not a

24  leap of logic when it's clear that the defendant had an

25  interaction with one of the pastors and it's clear that, based

Case 4:23-cr-00908-SHR-LCK   Document 26   Filed 07/13/23   Page 59 of 69

59

1    on the size of the community, the community leaders are well

2    known, and it was well known that Pastor Collins is gay and

3    Pastor Christiansen is a woman.

4        The -- there was also mention that there was nobody in the,

5    the room where the cots were set up at the Presbyterian church

6    and that it was an adjacent room.  That adjacent room was, as

7    Special Agent Tisch described, about six feet away from the

8    wall of the main church building.  So whether or not it was

9    part of the main church building or not, it was on the church

10   property and had the fire not been contained by the actions of

11   Douglas Fire Department and Douglas Police Department, it most

12   certainly would have gone up and, in fact, it did, according to

13   testimony, suffer fire damage.

14       And, again, the defendant would have no way of knowing

15   whether or not there were people there.  It was advertised and

16   it was well known in the community, according to Pastor

17   Christiansen, that they were doing this and he -- there's no

18   evidence that he would have any idea how to know whether or not

19   there was actually people in there.  And he certainly didn't

20   care that there was an operating day-care right across the

21   alleyway that had children and staff there.

22       There was also mention of how this is not a crime of

23   violence.  The definition under 3156 and the other cases that

24   were provided from the other districts, and maybe that's my

25   fault for citing the Arizona district court first, but our

1    other districts have found that for the purposes of 3142 that

2    under the definitions in 3156, arson is a crime of violence,

3    specifically because physical force has to be a pretty close

4    definition or closed definition for what else could setting a

5    fire be other than force?  And the fact that once a fire is

6    set -- and certainly the government's not alleging that there

7    was any physical harm done to anybody, but that's not what the

8    statute requires.  The statute requires damage to property.

9    And under the 3156 definitions, it's physical force against

10   person or property.

11        So for those reasons, Your Honor, we think that we've

12   certainly met that burden and, again, that's just determining

13   that is for the purposes of actually just having this hearing.

14   So I don't believe that that has any weight with regard to

15   whether or not the defendant is a danger to the community.

16        The government brought up and, admittedly, they're old but

17   his prior police contacts and the reason that we did so was

18   because force, the defendant used or threatened force against

19   property with people he disagreed with.  And that's exactly

20   what we're alleging happened here.

21        The defense also said that a neighbor was surprised but

22   there's no evidence why that person was surprised and also that

23   either neighbor who described being surprised also described

24   how the defendant didn't believe that women should be in

25   leadership roles or gays and that the defendant disagreed with

1   those practices in the churches.

2        And while the defendant does have three letters, as you

3   heard from the victim representatives, there's numerous people

4   from all over southern Arizona have expressed fear,

5   southeastern Arizona, excuse me.

6        And to the point of holding the defendant as finding him a

7   danger to the community and the defense is right, it's supposed

8   to be only done in a rare case, but this is a rare case.  The

9   defendant has gripped an entire region of this district in

10  fear, so much so that they don't even feel comfortable going to

11  their houses of worship.  I can't imagine a greater danger to

12  the community than that.  And we would ask that you impose the

13  recommendations of pretrial services and detain the defendant.

14  Thank you.

15            THE COURT:  Thank you.

16       The court's going to take a brief recess, probably about

17  10 minutes, so that I can re-review the letters and the

18  exhibits, I think just the complaint was admitted as the

19  exhibit.  So we'll take a 10-minute recess and then I'll be

20  back.

21       (A recess was had.)

22            THE COURT:  And we're back on the record.  I have had

23  an opportunity to review the following items in this case:  the

24  complaint, document number one, and also listed as Exhibit

25  No. 7, which has been admitted; the pretrial services report,

1    including the original pretrial service report dated May 25th,

2    the addendum dated May 30th, and the second addendum dated

3    June 14th.  In addition, I've had an opportunity to staff this

4    case with pretrial service officer Deborah Romero; I've

5    reviewed the government's motion, document 12; taken into

6    consideration the evidence, testimony, and argument from

7    today's hearing.  I've also taken into consideration the

8    letters that have been provided from the defense, from Diana

9    Dalton, Julio Romero, Jr., and C. James Quinn.  In addition,

10   I've taken into consideration the statements from all three of

11   the victims that had an opportunity to be heard at the hearing.

12       In considering 18 USC 3142, the court finds the following:

13   I do believe and recognize the cases that the government has

14   cited regarding malicious burning of any building, vehicle, or

15   other real personal property being a crime of violence,

16   including the district court from the District of Arizona 2010

17   case, the cases cited therefore from the Fourth Circuit, the

18   First Circuit, in addition to other cases that are listed on

19   page 7 of the government's motion.  And I do believe that this

20   particular crime under 18 USC 844(i) meets the definition of a

21   crime of violence.

22       In addition, the court does take into consideration the

23   3142(g) factors, the nature and circumstances of the offense

24   charged, which do include taking into consideration, as the

25   court has indicated, that this is a crime of violence, the

63

1  potential penalties for this case, which include a minimum

2  mandatory of five years.

3      The court takes also into consideration the weight of the

4  evidence against the defendant, which at this time indicates to

5  be strong evidence, although the court notes that that's the

6  least important factor with respect to the Bail Reform Act.

7  However, I do note the weight of the evidence included a very

8  distinctive car, surveillance video, and the additional

9  information that was provided at testimony and also in the

10  complaint.

11     In taking into consideration the history and

12  characteristics of Mr. Ridenour, I do also note, although he

13  does have ties to the community, no mental condition, no

14  substance abuse issues, previous employment, and has resided

15  within Douglas for a number of years, I also take into

16  consideration his past conduct both regarding criminal history

17  but also conduct with respect that was presented at testimony

18  regarding conduct and actions that could be related to the

19  allegations in this case.

20     Of most importance to the court is the nature and

21  seriousness of the danger to any person or the community if

22  Mr. Ridenour were to be released, which is a factor under

23  3142(g) that the court should consider.

24     In addition, I note under 18 USC 3771 that a crime victim

25  has a right to be reasonably protected from the accused.

1        This is a situation, as Mr. Rossi had indicated, that

2   generally detention on dangerousness issues or detention with

3   respect to a situation such as this should be done in a rare

4   case, and I do believe as Mr. Rossi has indicated, this is a

5   rare case.

6        This is a -- accused crimes dealing with a small community,

7   a close community, a community where four churches are in close

8   proximity to each other.  In that same area is a day-care,

9   residence.  Many of the churches and the community are involved

10  in assisting not only the homeless but anticipating assisting

11  with housing migrants, and it's a situation where, based on the

12  evidence -- on the testimony that was provided, including the

13  statements from the victim, that it's clear that there is a

14  real fear should Mr. Ridenour be released.

15       In addition, at this time, I find that there are no

16  conditions that could be set to reasonably assure the safety of

17  the community.  I do not believe this is a situation where

18  location monitoring is appropriate because, again, we're

19  dealing with a small community and an outlying community where

20  even if there was a location monitor, I believe it would be

21  difficult to be able to reasonably monitor the actions and

22  behavior.

23       I also note that the defense made the argument that the

24  government did not provide a sufficient nexus for interstate

25  commerce.  However, I do believe, based on the information in

1   the complaint, including all the information in the last

2   paragraph of the complaint, that there is probable cause to

3   believe that there is the interstate nexus, as another

4   magistrate judge in this district also found, based by signing

5   the complaint.

6        Based on all the information before the court at this time,

7   I do find that Mr. Ridenour is a danger to the community, that

8   no conditions can be brought forth at this time to overcome

9   that risk, so he will be detained as a danger.

10       Anything further, Mr. Rossi?

11            MR. ROSSI:  No, Your Honor.  Thank you.

12            THE COURT:  Ms. Arce, anything?

13            MS. ARCE:  Not in terms of detention but we did have

14   something just to bring to the court's attention.

15            THE COURT:  Sure.

16            MR. TARAIL:  And, Your Honor, if I can just make a

17   brief record.  The court has probably heard throughout this

18   hearing Mr. Ridenour coughing and wheezing and struggling for

19   air.  And that's as a result of a physical issue that he has,

20   chronic rhinosinusitis.  He's been taking a medication for that

21   for the last several years which alleviates all the symptoms

22   that he's going through now.  Unfortunately, the marshals in

23   contact with Core Civic have advised us that they won't provide

24   Mr. Ridenour the medication that he needs.

25       And the concern that I have is that his health is going to

1   significantly deteriorate.  He's already advised me that he has

2   extreme trouble breathing.  He's not able to sleep because he

3   keeps on not getting enough air and waking up in the night

4   worried that he's not going to get air.

5       And so we're not making any formal motion for the court at

6   this point but I did want to advise the court of this issue and

7   we will continue working with the marshals to see if we can

8   reach a resolution.

9           THE COURT:  Okay.  And, Mr. Tarail, have you been in

10  contact with Deputy Marshal Alexander?

11          MR. TARAIL:  Yes.  He forwarded me to Mr. Villegas and

12  Mr. Pedro Diaz-Flores, I believe.

13          THE COURT:  Okay.

14          MR. TARAIL:  But I've been trying to get in contact

15  with all of them.

16          THE COURT:  Okay.  And I will ask the deputy marshals

17  that are in the courtroom at this time to make -- reach out to

18  Deputy Marshal Alexander regarding the medical concerns that

19  Mr. Tarail has spoken about and then, Mr. Ridenour, we'll make

20  sure that hopefully can you get the medication that you need.

21  It's also important that you continue to reach out to the

22  medical staff at Core Civic, make sure that they're aware of

23  your medical problems, and I know sometimes it takes a while

24  but make sure that you continue to reach out to them so that

25  hopefully you can get seen.  All right?

1              THE DEFENDANT:  May I say something?

2              THE COURT:  Sure.

3              THE DEFENDANT:  When I was -- when I was -- I'm sorry.

4              THE COURT:  That's okay.  Go ahead.

5              THE DEFENDANT:  When I was first taken in, I made a

6    statement to them that I was on Dupixent and that's been, well,

7    going on a month now.  And I've approached them two other times

8    and I talked to the nurse practitioner and he told me because

9    of the expense of the drug that I wouldn't be able to get the

10   drug.  And I explained to him that I have a grant for the drug,

11   I just need to call and tell them where to ship the drug.  And

12   I haven't had any response.  It's very hard to get any kind

13   of --

14             THE COURT:  And I know I'm not completely familiar

15   with all of the medical protocol and procedures that the

16   detention facility has to use.  But hopefully Mr. Tarail and

17   Ms. Arce can be in contact with our deputy marshal liaison for

18   medical issues and they'll be able to reach out to the liaison

19   who will also reach out to the medical personnel at Core Civic

20   and hopefully we'll be able to get you not necessarily the

21   medication that you're currently on but hopefully something

22   very similar.

23             THE DEFENDANT:  Well, yeah, that's -- I'm sorry, Your

24   Honor.

25             THE COURT:  That's okay.

1       THE DEFENDANT:  That's the problem.  There's only, as

2  far as I know, the dupilumab, Dupixent, is the only drug of its

3  kind.

4       THE COURT:  Okay.  And, well, like I said, we'll just

5  have to -- I have no control over the policies and procedures

6  that Core Civic has so it's a matter we can -- we can try to

7  liaison between the court, the marshals, and Core Civic with

8  your counsel and hopefully come up with some sort of

9  resolution.  Okay?

10      THE DEFENDANT:  Thank you.

11      THE COURT:  All right.  Thank you.

12    In addition, just for purposes of the record, I also note

13  that the language in 3142 refers to safety of the community as

14  the danger of the defendant who might engage in criminal

15  activity to the detriment of the community which the court also

16  took into consideration in its ruling, in addition to the

17  danger to the community regarding any other economic harm.

18    In addition, for purposes of the definition of the crime of

19  violence, I also took into consideration physical force used

20  with respect to damage to property.

21    Anything further, Mr. Rossi?

22      MR. ROSSI:  No, Your Honor.  Thank you.

23      THE COURT:  And, Ms. Arce or Mr. Tarail?

24      MS. ARCE:  No, Your Honor.

25      THE COURT:  All right.  Thank you.

1        Thank you, Mr. Ridenour.

2        (The matter was concluded at 5:01 p.m.)

3

4

5

6

7                    C E R T I F I C A T E

8

9

10        I, Cindy J. Shearman, court-approved transcriber,

11   certify that the foregoing is a correct transcript from the

12   official digital sound recording of the proceedings in the

13   above-entitled matter to the best of my ability.

14

15

16   __s/Cindy J. Shearman_____        July 13, 2023_
     Cindy J. Shearman, RDR, CRR, CRC        Date
17

18

19

20

21

22

23

24

25